IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| TARA WHITE, STEPHANIE KIMMERLY, and JENNIFER LOUPEE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | COLLECTIVE ACTION |
| v. | ) ) | CASE NO.: |
| ELKHART COMMUNITY SCHOOLS, | ) ) | |
| Defendant. | ) ) | |

**PLAINTIFFS' COLLECTIVE ACTION COMPLAINT FOR DAMAGES**

### I.  Introduction

1.     The United States of America long ago adopted and implemented a fundamental policy of equality that can be easily summarized into a simple phrase: women deserve equal pay for equal work.

2.     Despite this long-standing and straightforward concept, the reality of the operation of the Elkhart Community Schools tells the story of a school corporation whose female administrative and professional staff are consistently and repeatedly devalued. Womens' career trajectories are blunted, marginalized, under-valued, and often passed over for promotions. Their professional performance and conduct is judged more harshly than men, and they are routinely given little to no opportunity to effectively negotiate for better wages and conditions, while male employees are frequently given the opportunity to advance their careers and increase their compensation through negotiations, or merely existing within the system. Complaints by women are routinely ignored, or disregarded as trivial, while concerns of male employees are given increased attention. Scrutiny of female job performance is far stricter than with males, and male

bad behavior is often ignored or trivialized. For a woman to succeed at Elkhart Community Schools, she has to work twice as hard, and without receiving equal compensation.

3.     Tara White, Stephanie Kimmerly, and Jennifer Loupee ("Plaintiffs") are three current or former female administrators for Elkhart Community Schools, who have all been harmed by the pay disparities between the sexes within the school corporation.

4.     In order to stop the pay disparity between men and women, and in order to encourage Elkhart Community Schools to take action to fix this problem, the Plaintiffs, on behalf of themselves and all other women who are similarly situated ("Collective Action Members") are bringing legal claims for violations of the Federal Equal Pay Act ("EPA"), 29 U.S.C. § 206(d).

## II.  Jurisdiction and Venue

5.     This Honorable Court has jurisdiction over this case under 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States of America. The federal law claim asserted in this matter arises under the Equal Pay Act, codified at 29 U.S.C. § 206(d).

6.     This Honorable Court has personal and general jurisdiction over Elkhart Community Schools, as the school corporation is located and operated within this District, in Elkhart County.

7.     Under 28 U.S.C. § 1391, the Northern District of Indiana is the proper venue for this case because it is the judicial district in which the events and omissions that gave rise to the Plaintiffs' claims occurred, and the district where the Defendant resided at the time that the events and omissions that gave rise to the Plaintiffs' claims occurred.

## III.  Parties

8.      Plaintiff Tara White is a female who is employed as an administrator and/or professional staff member with Elkhart Community Schools. She is a citizen of the United States of America, presently residing in St. Joseph County, Indiana. At all times relevant to this Complaint, she was employed as an administrator or professional staff member for Elkhart Community Schools, and she has worked within Elkhart County in this capacity for several years. As of the filing of this Complaint, she continues to be employed by Elkhart Community Schools.

9.      Stephanie Kimmerly is a female who was until recently employed as an administrator and/or professional staff member with Elkhart Community Schools. She is a citizen of the United States, and presently resides after a recent relocation in Raleigh, North Carolina. At all times relevant to this Complaint, however, she worked for several years within Elkhart County for Elkhart Community Schools. She worked for Elkhart Community Schools from 2005 until 2018, first as a teacher, and later as an administrative and/or professional assistant in positions of academic dean and assistant principal. She recently resigned from her position with Elkhart Community Schools as a result of her frustration with the situation complained about within this Complaint.

10.     Jennifer Loupee is a female who has spent the past several years employed as an administrator and/or professional staff member with Elkhart Community Schools. She is a citizen of the United States, and at all times relevant to this Complaint has been a resident of Elkhart County. At all times relevant to this Complaint, she worked for several years for Elkhart Community Schools, first as a teacher, and later as an administrative and/or professional assistant in various positions, including as an assistant principal. She recently left Elkhart Community Schools in the Spring of 2018 to take a position as a principal with another local

school system, in part out of frustration with the situation complained about within this Complaint.

11.     Defendant Elkhart Community Schools ("ECS") is the school corporation for the City of Elkhart, located in Elkhart County, Indiana. It employs, administrates, and operates numerous teachers, administrators, and staff members that operate fourteen (14) elementary schools, three (3) middle schools, and two (2) high schools and related secondary institutions in the City of Elkhart, Indiana.

### IV.  General Factual Allegations

12.     The Plaintiffs are all current or former female administrative or professional employees for ECS, having worked for the Defendant over the past several years.

13.     During the course of their time working for ECS, all of the named Plaintiffs have noticed, experienced, and complained of pervasive and routine situations where female administrators or professional employees for ECS are continually discriminated against in relation to their compensation. Female administrators or professional employees for ECS routinely perform equal work, with equal skill, effort, and responsibility, as the work performed by male employees, and yet they do not receive equal pay for their efforts.

14.     Male administrators or professional employees for ECS are routinely given easier access to promotions, increases in pay and benefits, opportunities for career advancements, and opportunities to negotiate for better pay or benefits, while these advantages to career advancement are denied to similarly situated female administrators or professional employees.

15.     This discriminatory pattern of conduct has been in place since at least 2015, and likely much longer. However, as the statute of limitations for actionable claims under the Equal Pay Act is only three (3) years back from the filing of a claim, the allegations in this Complaint

shall seek to focus solely upon the relevant time frames from approximately 2015 through the present.

16.     This discriminatory pattern of conduct is readily known, and has been acknowledged by numerous ECS employees and administrators, but no action has been taken to remedy this discriminatory situation. The Plaintiffs have filed this lawsuit seeking to achieve and bring about that remedy, in order to properly compensate the many female administrative employees who provide equal work without equal pay in comparison with male administrators.

### 1. Description of Collective Action Members

17.     Plaintiffs seek to bring similar claims under the Equal Pay Act for themselves individually, as well as on behalf of all of those similarly situated female Collective Action Members, who have been subjected to the routine and pervasive inequalities described within this Complaint.

18.     ECS as a school corporation employs over 2,000 individuals in varying capacities, including a wide variety of jobs, ranging from teachers, support staff, assistants, substitutes, janitors, and food preparation staff. Plaintiffs do not go so far as to allege that the discrimination described within this Complaint extends to all female employees of ECS.

19.     The Collective Action Members constitute a more limited subsection of employees that could more accurately be described as administrators and/or professional staff. While the official titles and names of these jobs may change from year to year, they could more accurately be described generally as individuals who are responsible for the supervision of district instructional programming or who are involved in making recommendations regarding hiring or discipline. Examples of the general types of job titles applicable to the Collective Action Members are as follows:

> superintendent; deputy superintendent; assistant superintendent; executive director; executive assistant; senior director; director; assistant director; supervisor; principal; assistant principal; athletic director; assistant athletic director; academic dean; program manager; program director; specialist; facilitator; coordinator; and secretary.

These positions are all involved in the upper level administration of ECS, and have increased responsibilities, as well as educational requirements and standards.

20.     To more specifically describe some of the titles and positions that make up the Collective Action Members, the following list of positions are included within the Collective Action Members, though this list is by no means exhaustive:

> Superintendent of Schools; District Counsel/Chief of Staff; Executive Assistant to the District Counsel/Chief of Staff; Secretary to the Board of School Trustees; District Director Co-Curricular Programming; Director of Building Services; Assistant Supervisor of Building Services; Secretary of Building Services and Facility Rentals; Chief Financial Officer; Supervisor of Accounting, Audits, and Investments; Controller; Executive Assistant to the Chief Operating Officer and Chief Financial Officer; Certified Payroll; Classified Payroll; Payroll Assistants; Insurance; Accounts Payable; Staff Accountant; Purchasing; Copy/Mail Room; Director of Communications; Digital Communication Specialist; Data Assessment Manager; Data Specialist; Program Manager for Adult & Community Education; Data Analyst; Child Care Coordinator; Evening Secretary; Director of Food Services; Secretary to the Director of Food Services; Food Services Bookkeeper; Food Services Bid & Commodity Specialist; Food Services Training Specialist; Executive Chef and Specials Events Coordinator; Director of Human Resources, Assistant Director of Human Resources; Executive Assistant/Certified Staff Support; Secretary for Human Resources; Receptionist, Human Resources; Assistant Superintendent of Instruction; Director of Secondary Instruction; Director of Elementary Instruction; Director of Federal Programming; Director of Technology Integration; Systems of Support Facilitator; Early Childhood Facilitator; Executive Assistant to the Assistant Superintendent; Secretary to the Director of Federal Programming; Director of Literacy; Library Services; Assistant Superintendent of Student Services; Director of Special Services; Supervisor of Special Services; Supervisor of Student Services/Attendance Officer; Supervisor of Connective Leadership and Inclusion; Director of Elkhart Elementary Academy; District Graduation Facilitator; District Translator; Bully Prevention Coordinator; Executive Assistant; Registrar; Secretary to the Registrar; Director of Technology Services; Technical Support Manager; Director of Transportation; Assistant Supervisor of Transportation; Secretary to Director of Transportation; Route/Driver Coordinator; Route/Driver Coordinator of

Special Programs; Route/Driver Coordinator; as well as Principal, Assistant Principal, and Academic Dean positions at the various nineteen (19) schools operated within the district.

21.    That while ECS has numerous school buildings and locations, they are all clustered geographically around Elkhart, Indiana. ECS maintains a central administration of the school district headed by a Superintendent, and the salaries and benefits that the administrative and/or professional employees receive are centrally controlled. The centralized administration of ECS controls the job descriptions and changes to job descriptions for administrative and/or professional employees, along with their assignments to various buildings within the district. The centralized administration controls the creation or alteration of responsibilities for new or existing administrative and/or professional jobs. Based on this centralized control of administrative and/or professional employees, the entire school district constitutes on establishment for the purposes of this Complaint.

22.    In any given year applicable to this claim, it is estimated by the Plaintiffs, given their knowledge and experience at ECS, that the administrative and/or professional staff employees that the Collective Action Members seek to limit their class-based claims to likely ranged somewhere between one hundred (100) and two hundred (200) administrative jobs. Assuming some position turnover for the three (3) years of claims available by the statute of limitations, it may be estimated that the total number of individuals holding administrative jobs applicable to the class action may be somewhere between two hundred (200) and four hundred (400), though this number cannot be known precisely at this time.

23.    According to the knowledge and experience of the named Plaintiffs, it is estimated that approximately sixty-five percent (65%) of these positions during the applicable

three (3) year time-frame were held by women. These estimates, if anything, are likely low. For the explicit positions listed by name within Paragraph 20 of this Complaint, for example, ECS's current website [1] shows that of those eighty-two (82) presently listed positions, sixty-one (61) of those positions are staffed by females, making up roughly seventy-four percent (74%) of those positions listed.

24.    Despite the fact that women are far over-represented among the administrative and/or professional jobs that ECS has, even a brief review shows that over-representation does not equate to an equal distribution of the high-paying positions within ECS. In fact, the high-paying jobs massively and disproportionately are filled by male employees, while an inversely small amount of men make up the lowest paying positions. A review of a baker's dozen of the highest and lowest compensated positions shows this to be true. Among the thirteen (13) highest paid positions from July 1, 2018 through June 30, 2019, every single position with the exception of *one* position was held by a male. On the opposite end of the spectrum, a review of the thirteen (13) lowest paying positions for that time frame are all female with the exception of four male positions.

25.    Even based upon the assumption that sixty-five percent (65%) of the administrative and/or professional jobs applicable to the class during the three years covered by this claim were held by females, this means that it is estimated that somewhere between one hundred thirty (130) and two hundred sixty (260) female administrative and/or professional jobs potentially make up the Collective Action Members. Even discounting for duplicative claims for

---

[1] ECS maintains a website which lists a Staff Directory for ECS's administration staff, which at the time of the filing of this Complaint may be accessed for ease of reference at: http://elkhart.k12.in.us/home/administration/district-contact-information/

those retained in positions, or those who opt out or otherwise have no claim, it is still reasonably estimated that the Collective Action Members may total somewhere between fifty (50) and one hundred (100) female administrative and/or professional employees at ECS who may have valid legal claims under the Equal Pay Act, similar to the named Plaintiffs.

26.    That the best estimates for these numbers is more than sufficient to meet the numerosity requirements of Fed. R. Civ. P. 23, and constitute a class that is numerous enough that joinder of Collective Action Members' claims would be impracticable for the Court.

27.    That there are questions of fact and law common to the Collective Action Members, given the pervasive nature of the Equal Pay Act violations that were allowed to continue by ECS without proper redress. [2] Common questions for the Collective Action Members would surround the provision of comparisons of female employees establishing equal work, with equal skill, effort, and responsibility, along with examples in which male employees made more than the female; calculation of damages; evaluations of ECS's policies, procedures, and actions in evaluating, promoting, and advancing the careers of female Collective Action Members; and the evaluation of anticipated affirmative defenses that may be raised by ECS which would be common to the Collective Action Members.

28.    The similar claims and allegations of the Plaintiffs under the Equal Pay Act are all representative of the pervasive nature of the problems at ECS in relation to the wage gap between female and male employees. As such, the claims of the Collective Action Members will

---

[2] Greater factual details and more specificity regarding details to support the allegations relating to these factors is addressed within the ensuing sections of this Complaint addressing the factual allegations of each Plaintiff, and comparisons of employees.

be subject to common legal claims under the Equal Pay Act, common evaluations of damages allowed by that Act, and common defenses that may be raised by ECS.

29.    Additionally, the named Plaintiffs all have claims driven by their commonly shared experiences as female administrative and/or professional employees for numerous years at ECS. Two have been so impacted that they felt compelled to leave and seek employment elsewhere, and another continues to struggle to achieve equal pay. Given their shared experiences, the named Plaintiffs are proper representatives that can fairly and adequately protect their fellow female compatriots who are also struggling to receive fair pay for equal work.

30.    Given the pervasive nature of the conduct by ECS, and the common factual and legal questions applicable to those claims, the prosecution of so many claims on an individual basis would lead to inconsistent or varying adjudications with respect to Collective Action Members that have all been impacted by a pervasive problem. The disposition of these separate interests, especially in evaluations of ECS's action and policies, would lead to a substantial impairment of the Collective Action Members' interests.

31.    Additionally, ECS's refusal to address a problem that numerous employees have openly acknowledged as a serious issue for female employees constitutes a refusal of ECS to address a host of claims by female employees. The utilization of a colective action for all of those effected female employees serves the interest of allowing that entire class of claims to be addressed by ECS in a uniform fashion that is consistent with its uniform refusal to correct this problem for its female employees.

32.     The only major factual differences in relation to the claims of individual Collective Action Members are comparisons of equal work, and the calculation of damages. These individual differences are not nearly as important to the present Collective Action Members' claims as the evaluation of ECS's actions and policies. A collective action would ensure across Elkhart County that Collective Action Members would receive a uniform resolution of claims impacting numerous people in a relatively localized area of harm.

33.     Pursuant to 29 U.S.C. § 216(b), the Plaintiffs bring this action seeking injunctive, declaratory, and monetary relief not only on behalf of themselves, but on behalf of the Collective Action Members. The named Plaintiffs have all filed consent paperwork with the Court as required by the Equal Pay Act's collective action opt-in procedures, attached to this Complaint as Exhibits 1, 2, and 3.

### 2. Allegations of Plaintiff Tara White

34.     Tara White has worked as an administrative and/or professional for ECS for several years, in various positions. Entering into the 2016- 2017 school year, she was the Coordinator of Media Services & Digital Resources, a position that compensated her with a yearly salary of $75,280.00.

35.     On June 1, 2017, D.M., [3] a Deputy Superintendent, informed Tara White that Superintendent Dr. Rob Haworth had requested that Tara White be informed that she would be

---

[3] This Complaint will contain a great deal of information contrasting and comparing the salaries, actions, qualifications, conduct, and occasionally the misconduct of numerous ECS employees. While much of this information is public, the individual details about these different employees is more pertinent to this pleading than their identities. Wherever possible, simple descriptive initials and titles for employees will be used. This seeks to err on the side of caution in terms of protecting any of those individuals' interests in privacy, as many are potential Collective Action Members. It also seeks to provide an easy aid to the reader to allow a focus upon the more important figures in this pleading, as opposed to a laundry list of names and identities to remember. A list providing the details for the initials is available upon request.

hired as the Director of Literacy at a school board meeting on June 27, 2017, and that she would receive a contract starting July 1, 2017.

36.    In a subsequent meeting with D.M. on June 7, 2017, Tara White inquired as to what the terms of this contract would be. Later that day, D.M. informed Tara White that Dr. Harowth and Doug Thorne, District Legal Counsel and Chief of Staff, had requested that Tara White put together a proposal of what she was hoping for in relation to the terms of a new contract.

37.    Tara White had been working in the position of Coordinator of Media Services & Digital Resources, prior to being offered the new position of Director of Literacy. The plan was that this new position of Director of Literacy would be a position in which Tara White would keep all of her job responsibilities she presently held as the Coordinator of Media Services & Digital Resources, and also take on the additional responsibilities of the position of Director of Elementary Instruction. J.C., a female employee, had been the Director of Elementary Instruction, until her recent retirement had left the position vacant in the summer of 2017. The new position of Director of Literacy was intended to allow Tara White to take over both of the responsibilities of her present position, as well as those of Director of Elementary Instruction.

38.    Prior to J.C.'s retirement, there were two administrative positions that were greatly equivalent in relation to their standing, authority, and responsibility. J.C. was the Director of Elementary Instruction, which generally can be described as having a supervisory role over district-wide elementary school educational curriculum, execution of educational strategic plans for the district, and collaboration with other administrators on data, testing, and elementary staff evaluations.

12

39.    A nearly identical role existed for the same purposes and responsibilities for the secondary educational schools, called the Director of Secondary Instructions. For the 2016-2017 school year, this position was held by B.K., a male administrative employee.

40.    Tara White prepared and delivered a written proposal for this new position on June 8, 2017. Said written proposal noted her bachelor and masters degrees, her administrator's license, and school media specialist certification, as well as her seventeen (17) years of experience in education. She compared and compiled a list of her accomplishments and the many committees and initiatives she was already responsible for, as well as the new responsibilities she would be taking over for the vacant Director of Elementary Instruction position. She compared and contrasted more than fifteen (15) similar administrative positions, contrasting the salaries, daily rates, duties and responsibilities, years of experience, and educational requirements, and requested consideration of a salary of $104,000.00, along with twenty-five (25) vacation days.

41.    On June 12, 2017, D.M. informed Tara White that the salary of $104,000.00 could not be considered, explaining that the job was classified among administrative positions as a job with a top-end salary of $93,000.00. D.M. informed Tara White that she could discuss this with Dr. Haworth at a later time, but that there would be no opportunity to negotiate the amount.

42.    On June 27, 2017, Tara White received a call at 8:00 a.m. from staff for Superintendent Dr. Haworth, requesting that Tara White meet with him at 9:00 a.m. that day. At the meeting, Dr. Haworth explained that the official title for Tara White's new position would be Director of Literacy, as discussed, and would include her current job responsibilities as well as that of the position of Director of Elementary Instruction. Dr. Haworth explained that Tara White would not be allowed any opportunity to negotiate upon the salary or vacation days, and

that the offered salary and terms would be for $92,000.00, and twenty (20) vacation days. Dr. Haworth confirmed that no opportunity to negotiate would be allowed, and that Tara White must make a decision immediately at this 9:00 a.m. meeting as to whether or not she would accept the position. Dr. Haworth explained that ECS had an administrative salary classification policy, which prevented negotiation and controlled what her salary would be.

43.    With no opportunity to negotiate, and being given no time to make a decision, Tara White accepted the position of Director of Literacy, and was approved by the school board that night.

44.    On June 30, 2017, Tara White met with J.C., the retiring Director of Elementary Instruction, and a plan was worked out to fully transition all of her duties and responsibility to Tara White for the 2017-2018 school year.

45.    Tara White worked for the next several months as the Director of Literacy, handling both her former duties, along with her additionally absorbed responsibilities of the former role of Director of Elementary Instruction.

46.    On April 30, 2018, Tara White had a routine meeting with D.M., Deputy Superintendent. At that meeting, D.M. explained that B.K., a male administrator, would be moving on from his role as the current Director of Secondary Instruction, leaving it open. D.M. explained that given some of the changing responsibilities of the positions, and Tara White's absorption of the Director of Elementary Instruction, that D.M. would be crafting a new job description for the role of Director of Secondary Instruction. D.M. explained that because Tara White's current job was directly equivalent in work and responsibilities, that ECS would simply be using Tara White's current job description, and mirror the same language for the description of the soon to be open job of Director of Secondary Instruction.

47.     D.M. made the changes to the job description for Director of Secondary Instruction, mirroring the language of Tara White's job as Director of Literacy. On May 22, 2018, P.L., a male employee, was hired to the equivalent position of Director of Secondary Instruction. He was issued a starting salary of $114,835.00, and was given twenty-five (25) vacation days.

48.     On May 30, 2018, Tara White was issued an Administrator's Evaluation from D.M., Deputy Superintendent. All portions of this evaluation reviewed Tara White's performance as excellent or at a high level. An additional addendum wrote a glowing account of Tara White's performance and the broad range of her responsibilities. A notation specifically noted that the recent addition of P.L. as Director of Secondary Instruction would only assist Tara White in accomplishing her goals for the district, by finally providing her with "an equal partner to oversee secondary curriculum[.]"

49.     On that same day, Dr. Haworth announced he would be resigning as Superintendent to take a new position at another school district.

50.     On July 10, 2018, it was announced that Mark Mow would take over as the Interim Superintendent of ECS. Mr. Mow previously served multiple administrative roles within ECS for forty-two (42) years, including as Superintendent from 2002 until Dr. Haworth took over in 2012.

51.     That same day, it was announced that Mr. Mow had appointed B.W., a male employee, to the currently defunct and unused position of Director of Elementary Instruction. B.W. was given a salary of $110,685.00, despite the fact that Tara White was performing all of the duties of that position, along with her previous position's responsibilities.

52.    Tara White was at the school board meeting where this was announced, and was obviously surprised that someone was being named to do a job she was already doing, as no one had discussed her position with her, or whether changes would be made. Tara White asked C.W., a female Director of Human Resources, if she knew anything about this announcement. C.W. responded that she knew nothing about this appointment, and no one had discussed the matter with Human Resources.

53.    On July 11, 2018, Tara White was called to C.W.'s office at Human Resources, where C.W. apologized for the surprise appointment, explaining that she was just as surprised. C.W. continued to explain that Mr. Mow and D.T., a male District Legal Counsel and Chief of Staff, had explained that B.W. was not performing effectively in his previous position of Director of Business Operations, and that Mr. Mow and D.T. felt that moving B.W. to another department would solve the problem. C.W. further explained that it was her belief given discussions with Mr. Mow and D.T. that they were not aware that Tara White was already handling all of the job responsibilities of the open position of Director of Elementary Instruction. C.W. informed Tara White that she was planning on addressing this matter with Mr. Mow and D.T. in the near future, in order to clarify what the division of duties between Tara White and B.W. would be.

54.    That same day, D.M., Deputy Superintendent, was called into Mr. Mow's office and offered a buyout or demotion, based upon the explanation that the Deputy Superintendent position was being eliminated for "purely financial reasons." D.M., a female employee, accepted the demotion to Director of Special Services. Shortly thereafter, a new position of Assistant Superintendent of Instruction was created, which was identical in function and responsibilities to the Deputy Superintendent position held by D.M. that had just been eliminated for "purely

16

financial reasons." B.S., a male employee, was promoted to the new Assistant Superintendent of Instruction position, and was provided with a $7,980.00 raise, to a yearly salary of $108,980.00.

55.    On July 16, 2018, B.W., the new male Director of Elementary Instruction, came to Tara White's office. Despite corrections, he routinely referred to Tara White as "Betty" throughout this meeting. The purpose of the meeting was to discuss B.W.'s new role as Director of Elementary Instruction. B.W. explained that he had been "out of the loop" educationally for a long time, and desperately needed Tara White's assistance to catch up on the current curriculum.

56.    B.W. also sought out information on how the Instructional Leadership Department was being operated. Instructional Leadership is the generalized term for the administrators in the department that Tara White worked in, which included her current position of Director of Literacy, and the positions of Director of Elementary Instruction, and Director of Secondary Instruction. These positions were formerly overseen by D.M. in the Deputy Superintendent job, but were moving to being overseen by B.S. in the new position of Assistant Superintendent of Instruction. This group works with principals and assistant principals on issuing and addressing district-wide educational curriculum.

57.    On July 23, 2018, Tara White was conducting the weekly Instructional Leadership department meeting, as usual. B.W. appeared at this meeting for the first time as Director of Elementary Instruction. He failed to bring any computer, and was unable to participate in the review of numerous digital files during the meeting. He continually moved closer and closer to Tara White, placing his hands on her shoulders multiple times. Tara White attempted to direct the course of the meeting towards addressing numerous issues that had been ongoing from the previous school year, in order to bring B.W. up to speed and "into the loop" as he had requested about pending issues within the department. B.W. responded in an aggressive

and dismissive manner. When Tara White suggested the possibility of setting up some meetings to assist in bringing B.W. up to speed, he reacted in a dismissive fashion, explaining that he would set all meetings, and not Tara White.

58.     On July 26, 2018, a meeting was held in Mr. Mow's office, along with B.S., the new Assistant Superintendent of Instruction, and B.W., the new Director of Elementary Instruction, and Tara White. The purpose of the meeting was to go over all of the duties that Tara White had assumed that used to be the Director of Elementary Instruction's job, which she had taken over in her absorption of that role in her position as Director of Literacy. The goal was to identify all of those duties, and determine which of those duties Tara White would continue to have, and which would be reassigned to B.W. now that he was the Director of Elementary Instruction.

59.     At the meeting, Tara White outlined a total of fifty-seven (57) duties that she had been responsible for in the last year or so. The outcome of the meeting was that Tara White was informed that B.W. would be assigned ten (10) of those duties and responsibilities, and that eleven (11) would be shared between Tara White and B.W. Tara White would be responsible alone for the remaining thirty-six (36) responsibilities. Mr. Mow explained that the working situation would be that Tara White would "work through" B.W., letting him know everything he needed to know about the job and what the principals needed to be held accountable for. Mr. Mow further explained that while the duties would be split or shared between them, he expected Tara White and B.W. to work together, and that B.W. "would be the heavy[.]" Despite explaining her desire to "be the heavy," Mr. Mow explained that he thought it best for B.W. to fill that role, and for Tara White to simply assist him.

18

60.    On August 10, 2018, Tara White attended a meeting at B.W.'s office, with the purpose of bringing him up to date on the program for Professional Learning Communities ("PLCs") that Tara White had developed, managed, and operated within the district. This is a professional educational development program, which more than six hundred (600) ECS educators and employees have participated in over the past few years. Throughout this meeting, B.W. continued to refuse to address Tara White by her name, instead routinely and dismissively referring to her as "hon."

61.    On August 16, 2018, B.W. issued an email to Tara White and other employees, in response to request by a new female elementary principal. B.W.'s response to these requests was that he was "On it like a tall dog," a sexualized reference to how a large dog would have intercourse with a smaller dog.

62.    Over the next few months, B.W. would continue to assert himself over Tara White in relation to roles and responsibilities which Tara White had, while simultaneously allowing Tara White to perform for B.W. many of the responsibilities of the old Director of Elementary Instruction position. Many of B.W.'s actions seemed to be solely intended to make Tara White's job more difficult. By way of example, B.W. began banning Tara White from routine meetings which she had previously organized and conducted, by holding such meetings privately and without her knowledge. These activities prompted other employees in Instructional Leadership to complain, including a widely shared email on August 30, 2018, which explicitly accused B.W. of setting up secret meetings with school principals and employees in order to get them to complain and react negatively to the curriculum implemented by the Instructional Leadership team, something that ignored basic tenets of the curriculum instituted by ECS. Tara White has been informed that many of these secret meetings were focused on her, and whether

or not she was a "trustworthy" administrator, despite her receipt of nothing but positive evaluations.

63.     Over the next few months, during the fall of 2018, there were numerous incidents where male principals began openly defying and challenging Tara White's role as an administrator. Many of these male principals were the same ones engaging in secret meetings with B.W. On at least two occasions, this led to open defiance of her authority as an administrative supervisor over the principals. Tara White made complaints to B.W., Mr. Mow, and others within the Instructional Leadership team. No action was taken towards the openly defiant male principals, and Mr. Mow's response was to attempt to remove more responsibilities from Tara White, insisting that B.W., as a male, could better handle communications and relations with these male principals. No effort was made to rectify the defiance and insubordination.

### 3. Tara White's role in the Administrative Salaries Committee

64.     On September 6, 2018, Mr. Mow formed an Administrative Salaries Committee, headed by several administrative employees, with the purpose of conducting a review of ECS's administrative salaries, salary schedule, and board policies on salaries to administrative employees. [4]

65.     Tara White was appointed to that Committee, along with two other female administrators, H.C., a principal at an elementary school, and M.W., an assistant principal at a middle school.

---

[4] This Administrative Salaries Committee came about as a result of numerous complaints, and the events leading to its origin are detailed further in the factual allegations made by the other female Plaintiffs.

66. On September 21, 20118, Mr. Mow presented the Administrative Salaries Committee with documents containing salary information for the past several years for all administrative and/or professional employees within the district. Mr. Mow explained that there had been numerous complaints about this recently, and that he believed that the salary schedule and the board policies relating to it required editing and revision. He then explained to the Committee that he was highly concerned that there were certain discrepancies based on gender in the payment of salaries that needed to be rectified, and may **have opened ECS to legally actionable claims for gender discrimination**.

67.     The meeting included discussions about an administrative salary classification system or policy that had been created to set classes of compensation for different positions. This was the same classification system that had been relied upon as a justification as to why Tara White could only have a maximum salary of $93,000.00 when she took the Director of Literacy position, and as a reason why Tara White could not negotiate her salary.

68.     During this meeting and discussion of the classification system, Mr. Mow called in D.T., the male District Counsel/Chief of Staff, in order to ask some questions about how the classification system in the board policy was created and how it operated. D.T. explained that Dr. Rob Haworth, the previous Superintendent, had begun and created the classification system. However, the policy was never actually completed and fleshed out with reliable factors, and that the classification system was nothing more than some artificial classes that were created and reflected only what those jobs did at the time the classification system was initiated. D.T. further explained to the Committee that the only reason there were discrepancies in pay based on gender reflected in the ECS salaries was because "women just aren't as good at negotiating their

contracts as men." This was somewhat shocking to Tara White, who had been expressly

informed that she was not even *allowed* to negotiate issues of compensation.

69.    On September 25, 2018, Tara White made two presentations to the ECS School

Board of Trustees, presenting information about the upcoming ILEARN testing for

English/Language arts in grades three (3) through eight (8), as well as a presentation on the

PLCs program progress throughout the district. The following day, Mr. Mow congratulated and

praised her fine work on these presentations.

70.    On November 1, 2018, the Administrative Salaries Committee met, and presented

its completed findings to Mr. Mow and Mr. Thorne. A summary of the more pertinent findings

presented in that report are as follows:

> a. Job classes are not consistent with job titles
> b. No documentation of how jobs were assigned to classes
> c. Incomplete, incorrect and/or non-existent job descriptions
> d. No evidence of consistent application of criteria for classification of positions
> e. No evidence of any consistent pattern of criteria applied in raises
> f. No consistent annual salary review process for administrators as outlined in the board policy
> g. Multiple examples of males with less experience than their female counterparts making more money
> h. Multiple examples of females with equal or greater experience than their male counterparts making less money
> i. Several newly created positions with salaries that don't seem to equal the responsibilities
> j. No opportunity provided to negotiate contracts
> k. No communication prior to hiring at board meetings
> l. False information provided during negotiation of contracts

71.    In response to the provision of this information, Mr. Mow congratulated the

Committee on its excellent work. He further expressed his concern that a legally actionable

situation involving the gender pay gap was far worse than he originally thought. H.C., a female

Committee member, asked Mr. Mow what the plan would be going forward, based upon her

personal knowledge that many female administrative employees had already expressed concerns that they were underpaid prior to the review of the Committee. Mr. Mow explained that continued meetings of the Committee would need to take place, but otherwise gave no solid plan as to further action.

72. On November 5, 2018, the Instructional Leadership department met for a weekly meeting. At that meeting, B.S., the Assistant Superintendent of Instruction, who was Tara White's immediate supervisor, explained that Tara White would be removed from the leadership of the elementary principal PLC groups. Yet another responsibility was being stripped from Tara White, despite the fact that she began, developed, and continually oversaw the PLCs program within the district. W.M., a male Director of Technology Intergration, openly questioned why Tara White was being removed, as she was the leader and expert on the PLCs programs. No explanation was provided, but over the objections from staff B.S. agreed to leave Tara White in her position as the leader of the PLCs.

73. On November 7, 2018, things came to a head for Tara White, and she met with B.S., her supervisor, in order to address a number of grievances that she had with her present treatment. She provided him with a bullet-point presentation of her many concerns, which may be summarized with the following topics:

> a. Her complaints about unequal pay due to her gender, and the many men who seemed to be promoted and paid more for similar work;
>
> b. Her complaints that as a woman she was not allowed to negotiate her contract, but that she was aware of other similarly situated men who were given the opportunity to negotiate (including the opportunity to negotiate and receive twenty-five (25) vacation days, something she was told she could not do);
>
> c. Her concern that she was provided no time, nor options, to consider her pay or advancement, being forced to accept advancement on the spot;

d. Her concerns that she had taken over *two* jobs in becoming the Director of Literacy, but that B.W. was simply given the position of Director of Elementary Instruction without any opportunity for her to interview or attempt to keep the job responsibilities she was already performing;

e. Her concern that she was continuing to do many of the jobs of B.W., or to do his work behind the scenes, while he was paid more than her for doing less work;

f. That when a new Director of Secondary Instruction was created, the position was nearly identical in description, work, and responsibilities to her Director of Literacy position, but when a male employee filled the position, he was paid more;

g. Her concern that after B.W. was installed as the Director of Elementary Instruction, he continually made her job more difficult, stripping her of responsibilities, and by routinely engaging in demeaning and dominant behavior towards her;

h. Her concerns that most of her previous responsibilities were retained by her after B.W. was installed as the Director of Elementary, and yet she seemed to be judged by a far stricter standard, while B.W. knew little of the current curriculum or programs, but was shown leniency;

i. Her concerns that responsibilities were being stripped from her, and given to B.W., providing a continued implication that as a woman she was not fit to deal with or confront insubordinate male employees, and that only a male could do that job.

74.    After addressing her various concerns within her employment environment, Tara White did exactly what she should have done; she requested that she receive equal pay for equal work. She requested that her pay be raised to $108,980.00 to be in line with the nearly identical position of Director of Secondary Instruction, the position modeled after hers in work and responsibility (in reality it had less responsibility), where a male employee was hired at that amount. She also requested back pay, and to be provided the twenty-five (25) vacation days she was not allowed to negotiate for, that other male employees had been able to negotiate for. B.S. explained that he would discuss the matter with Mr. Mow, and get back to her.

75.     On November 15, 2018, Tara White met with Mr. Mow and B.S., the Assistant

Superintendent of Instruction. Mr. Mow was clearly agitated, and visibly angry during the

meeting. Before discussing any of Tara's concerns with her employment environment, Mr. Mow

started the meeting by explaining/threatening that he would soon be making recommendations

for the elimination of several administrative employees on December 11, 2018. In response to

this statement, Tara White asked if her position was being considered for elimination. Mr. Mow

gave a noncommital response, and then requested that Tara White explain her concerns.

76.     Tara White attempted to address and recount each of her concerns. For each

concern raised, Mr. Mow was dismissive, or simply explained away the problem. He insisted she

was not the least paid individual in her department, and insisted any statements by D.T. insisting

that men are simply better negotiators was nothing more than a "joke." Tara attempted to take

notes throughout the meeting, until a visibly angry Mr. Mow demanded that she stop taking

notes.

77.     In response to the litany of concerns raised by Tara White, Mr. Mow responded

that it was his belief that the elementary instruction curriculum for ECS was "in chaos," and that

Tara White may have a great deal of responsibility and blame for its state. Tara White responded

that all of the evaluations that she had ever received as an administrator were positive, and rated

her as highly effective, so that she did not understand why these concerns were being raised out

of the blue at the present moment, especially when Mr. Mow himself had recently congratulated

her on her presentations to the school board.

78.     In response to Tara White's concerns about B.W. and his frequently sexually

demeaning or dominant and dismissive behavior towards her, Mr. Mow was again dismissive,

and ordered Tara White that she simply had to "get along" with B.W. He then told Tara White

that he would be having her job description changed, and would get back to her on the back pay and compensation issues. When Tara White asked if he could provide her with a timeline for an expected response, Mr. Mow expressly informed her that he would not be providing her with one.

79.     On November 19, 2018, Tara White returned to her office to find a memo on her desk from Mr. Mow. In it, he reiterated without explanation his concerns about Tara White's qualifications for her positions. He affirmed that B.W. was acting exactly as Mr. Mow wanted him to be acting, and again he raised unexplained concern with Tara White's performance of her job duties.

80.     On November 26, 2018, Tara White met with C.W., a female Director of Human Resources. She explained and reported her concerns that Mr. Mow and B.W. may be acting in a retaliatory fashion. She expressed her fears that it was only after she demanded equal pay that Mr. Mow suddenly was attempting to document vague concerns about her performance for the first time at ECS, and was concerned that the memo was prepared simply to place into her personnel file in retaliation for raising her concerns. She was also concerned given Mr. Mow's opening comments during their meeting that he may attempt to fire her simply for demanding equal pay.

81.     On November 27, 2018, Tara White was informed by a colleague that Mr. Mow had provided the school board with a list of names of people who should be terminated as employees, and that Tara White's name was on the recommendation. At this time, Tara White had still never received a poor evaluation of her job performance.

82.     On November 29, 2018, Mr. Mow cancelled all future meetings of the Administrative Salaries Committee.

### 4. Allegations of Plaintiff Stephanie Kimmerly

83.     Plaintiff Stephanie Kimmerly has also spent the past several years since 2005 employed by ECS, in roles ranging from a teacher to an administrator. She has a bachelor's degree in elementary education, and a master's degree in Educational Leadership & Administration.

84.     Beginning in 2013 through 2015, Stephanie Kimmerly worked as a district academic coach within the Instructional Learning Department that Tara White worked in, and completed an administrative internship with a highly effective rating.

85.     Beginning in 2015, Stephanie Kimmerly was appointed as an academic dean for a local elementary school. Academic deans perform many of the responsibilities similar to assistant principals, and serve as administrators under principals.

86.     Early on, Stephanie Kimmerly began having problems working under the male principal of the elementary school. The male principal made propositions to Stephanie Kimmerly to go out for alcoholic drinks, and made sexually suggestive comments and gestures, many of which Stephanie Kimmerly attempted to avoid or ignore.

87.     Early on, Stephanie Kimmerly began performing numerous job responsibilities for the elementary school that were less consistent with her job of academic dean, and more consistent with the job responsibilities of an assistant principal or even a principal. Her male principal made it clear that he expected Stephanie Kimmerly to perform much of his work for him, and expected to take credit for her work.

88.     As time progressed, it became clear that despite her title, Stephanie Kimmerly was performing far more job responsibilities than her own. She prepared and ran all staff meetings and trainings, created instructional and staff schedules, prepared teacher evaluations for

the male principal, served on school committees, served as the building testing coordinator, handled most of the discipline and formalistic paperwork.

89.    During this time, Stephanie Kimmerly began seeking advancement to a higher-paying assistant principal or principal position, in order to seek higher payment for much of the work that she was already doing. Her first interview for an assistant principal position was with staff and a male principal at another local elementary. The male principal left half-way through the interview, and remaining staff began to question whether or not Stephanie Kimmerly would be able to handle taking orders and working under a "dominant male." She was not offered the position.

90.    At this same time, Stephanie Kimmerly began to make complaints to local administrators and the Deputy Superintendent, expressing her concern with her working conditions, and the situation where she was performing many of the duties of her current male principal supervisor for him. She also raised numerous concerns about his failures to meet deadlines, attend meetings, his missed work, and poor performance scores. In response to some concerns she raised about the male principal's operation of his duties, she was informed that the Deputy Superintendent and the Superintendent's office were aware that there was a history of complaints about his performance as a principal, but explained that none of these past issues had been documented.

91.    Shortly after this, and as her concerns continued to mount about her male principal, Stephanie Kimmerly scheduled a meeting to relay these concerns to the Superintentdent. She expressed concern about being forced to perform many job responsibilities of her male supervisor, and expressed concern that this would limit her ability to advance her career and compensation.

92.     At around the same time, Stephanie Kimmerly began participating in several Elkhart Principals Association (EPA) meetings, where she and several other female administrators began to voice concerns and complaints about gender pay equality issues. Male leaders from these organizational meetings reported this information to the Superintendent, but no follow-up meetings were ever scheduled with the EPA.

93.     After vocalizing some of her concerns about her male principal's leadership, and concerns about gender pay equality, Stephanie Kimmerly began to notice her work conditions started to change. Her male principal, without explanation, seemed to become increasingly rude and hostile to Stephanie Kimmerly. He made several threats to her that the school was "his building, and not her's", and began to strip opportunities from Stephanie Kimmerly in an attempt to isolate her professional development. During this time, he continued to be unprepared to events and meetings, and displayed numerous acts that appeared to be unprofessional, such as intervening in his own child's grades as a student at the school. At one point in time, he considered not reporting to law enforcement an incident of child sexual assault which occurred in the bathroom, until Stephanie Kimmerly intervened and berated him for even considering such an illegal act.

94.     As her working conditions continued to deteriorate, the male principal issued an evaluation of her performance which contained numerous negative and factually incorrect statements about her. Stephanie Kimmerly complained to the Deputy Superintendent that she was concerned she was being retaliated against for raising some of her concerns about the male principal's job performance, and her role in complaints about gender pay issues.

95.     Despite her many complaints to superiors about the male principal's job performance, and the working conditions where she performed much of his job responsibilities,

Stephanie Kimmerly was never offered any promotion to assistant principal, or any pay increase during her two years at the school.

96.    During this time, it became known that two male assistant principals had been provided verbal and informal "principal in waiting" status, along with pay increases, despite the fact that one of these assistant principals had only been in the ECS system for two years. Stephanie Kimmerly inquired to the Superintendent's office what sort of criteria she needed to earn or qualifications she would need to show to similarly advance her career, and was provided no response. She made vocal complaints about this to EPA leadership, but still no response or explanation of criteria was provided.

97.    Towards the end of her two years term as an academic dean, Stephanie Kimmerly interviewed for a local elementary principal's position. During this interview, the Superintendent was dismissive of her opportunity to actually obtain the position, and explained that she needed interview experience, and needed to find a better way to "market herself."

98.    In response, Stephanie Kimmerly gathered numerous glowing testimonials from staff she had worked with, designed a personal web-based leadership portfolio, started a principal leadership blog with printable resources, constructed an interview flipbook, and created an extensive ninety (90) day principal entry plan for future interviews. After subsequent interviews and meetings with the Superintendent, and his review of these materials, the Superintendent expressed disregard for these efforts, and openly questioned whether or not Stephanie Kimmerly would be prepared for an assistant principal position, let alone a principal's position, despite his knowledge of her many complaints about already performing many of the essential duties of a principal at her present job.

99.     Shortly following this meeting, Stephanie Kimmerly interviewed for an assistant principal position at another elementary. She was informed that a male competitor was going to be given the job over her, and that the reason was because of his classroom experience teaching elementary. This ignored Stephanie Kimmerly's own lengthy experience teaching elementary school classes.

100.    Moving into the 2017 and 2018 school year, the Superintendent finally spoke with Stephanie Kimmerly about the potential for her to have an assistant principal position. During the meeting, he offered Stephanie Kimmerly the assistant principal position at a local elementary that was considered to have serious problems, failing students, and a generally dire educational situation. The Superintendent explained that he thought that Stephanie Kimmerly's excellent leadership skills and professionalism could be a true asset at the school, but explained that this would be a profoundly more difficult job than many of the other assistant principal positions within the district. He explained that the job would be becoming even more difficult, because recently the school had four (4) different administrators assigned to it, and moving forward there would be only two (2). He explained that the school appeared to be failing with four, and that the reduction to two staff members would make the assistant principal job even more difficult than it already was.

101.    Stephanie Kimmerly was offered the job, and given a brief period of time to review her offered contract. Using the ECS salary classification system, she was offered the lowest class pay of any assistant principal salary in the district. She questioned the Human Resources Director as to why this was the case, but she could provide Stephanie Kimmerly with no explanation as to how the salary classification system actually operated.

102.    Stephanie Kimmerly was concerned as to why she was being assigned to what was being described as an especially difficult assistant principal position, with less support than it had previously, at the lowest possible pay. She scheduled a meeting with the Superintendent in order to address some of her concerns about another position which may require her to work harder than other similarly situated positions, but for less pay, and for some explanation as to the factors and criteria used for the salary classification system.

103.    The Superintendent was furious in response to the questions about the salary Stephanie Kimmerly was being offered. He openly questioned her loyalty, and explained that she should feel lucky to even be offered the position, and could simply take the position at the offered amount or refuse it, but there would be no explanation or negotiation about the compensation.

104.    Stephanie Kimmerly attempted to explain that she felt that she was being offered less pay for more work than similarly situated male assistant principals. She explained by way of direct comparison that one of the male assistant principals who had just *left* the job she was being offered had less overall educational experience and less time overall at ECS, and yet he was paid more than Stephanie Kimmerly was being offered. This, despite the fact that the previous male assistant principal had less work because there had been four administrators at the school.

105.    Stephanie Kimmerly made it clear that she believed that her gender may be a reason for why she was not being offered a higher salary or an opportunity to negotiate for a higher salary. The Superintendent refused to provide her with any explanation, and dismissed Stephanie Kimmerly from the meeting, without any further opportunity being given to discuss or negotiate her pay.

106. However, within a week of this meeting, the Superintendent called a meeting where it was announced that an Administrative Salaries Committee would be put together to review issues of gender pay equality.

107. As a result of these events, some complaints began to be voiced to Stephanie Kimmerly. For example, the Human Resources Director complained to Stephanie Kimmerly that now a large effort would have to be undertaken to look into the issues of gender pay equality. The Human Resources Director informed Stephanie Kimmerly that upon review, it appeared that there was a large gender equality pay gap problem. She also confirmed to Stephanie Kimmerly that the salary classification system apparently was unexplainable, completely subjective, and seemed to have no solid standards to actually support the classifications.

108. Shortly after these events, mid-year in her position as the assistant principal at a new elementary school, her male principal was removed after numerous poor reviews and some controversy involving a lawsuit. He was "**demoted**" to an assistant principal position at another school, and yet he was provided with an **increase in pay**.

109. Following the appointment of a new principal at her school, Stephanie Kimmerly openly questioned why she was at least not considered for the position. An Assistant Superintendent told Stephanie Kimmerly to be "courageously patient" and wait for an opportunity for advancement to be a principal.

110. Soon after, Stephanie Kimmerly began to hear that some teachers and staff members were being encouraged by the Superintendent's office not to consider going to work at Stephanie Kimmerly's present elementary school. This confused Stephanie Kimmerly, who was strongly encouraged by the Superintendent to take such a difficult job. Stephanie Kimmerly became concerned that her vocal complaints about gender pay were resulting in a form of

retaliation that sought to isolate her, and make it more difficult for her to progress within her career.

111.    The summer of 2018 brought about a final straw for Stephanie Kimmerly. She interviewed for three principal job opening at three different elementary schools, including the former elementary school where she was an academic dean. The male principal she had previously worked under there had finally been demoted to a position of assistant principal, but he was allowed to keep his principal's salary.

112.    The interviews for the three principal positions all went well. Staff from Stephanie Kimmerly's elementary where she had served as academic dean issues glowing calls of support for her installation as principal. In all of the interviews, Stephanie Kimmerly scored highly in the interview process.

113.    Oddly enough, Plaintiff Tara White was part of those interview teams. She can confirm that Stephanie Kimmerly scored highly enough to be a very strong candidate for all of the principal positions. However, during the interview process, the Superintendent explicitly explained to Tara White that Stephanie Kimmerly would not be considered for the any of the principal positions, despite her scores, and would not be allowed to move forward in the process for the search for the three principal jobs.  Tara White expressed concern about what possible reason could exist to prevent her being considered for the jobs, and was only provided with the vague explanation that Stephanie Kimmerly had "issues." No further explanation was provided, and Stephanie Kimmerly was not offered any of the jobs.

114.    Shortly thereafter, a male employee who had not even interviewed for the principal positions was appointed without any notice to one of the principal positions.

115.    Heartbroken with the constant difficulties she was encountering and the retaliation which was directed towards her for speaking up about gender pay issues, Stephanie Kimmerly felt she had no choice but to resign from her position and seek employment elsewhere. No attempt was made by ECS to even interview or question her about her resignation, despite more than a decade of service to ECS.

### 5. Allegations of Plaintiff Jennifer Loupee

116.    Plaintiff Jennifer Loupee has also spent the past several years, since 2009, employed by ECS, in roles ranging from a teacher to an administrator. She has a bachelor's degree of science, and a master's degree in Educational Leadership, as well as an administrator's license.

117.    Jennifer Loupee began teaching elementary school second and third grade classes for ECS starting in 2009. Beginning in 2015 she interviewed and was promoted to the position of academic dean at Woodland Elementary School. She held that position for approximately two years, before being promoted to assistant principal of Woodland Elementary School for the 2017 through 2018 school year.

118.    Jennifer Loupee was interviewed for the academic dean role by the male principal of that school, along with another male administrator. At no point in time was Jennifer Loupee ever provided with any sort of opportunity to negotiate her pay, compensation, or benefits. It was explained to her that ECS used a salary classification system to determine starting pay, however there was no explanation as to what sort of factors were actually used in determining this salary classification system. Without any opportunity to negotiate, Jennifer Loupee had no option other than to simply accept was she was offered.

119.    Roughly two years later, she was promoted without interview to the position of assistant principal for Woodland Elementary School. There was no interview, and she was never provided with any opportunity to negotiate her salary, compensation, or benefits. Again, it was made clear to her that these could not be negotiated, and that she simply had to accept ECS' salary classification, and accept the amount of salary that was being offered.

120.    Jennifer Loupee accepted the assistant principal salary that was offered, which was $62,280.00. She was aware that Stephanie Kimmerly, another new female assistant principal, was also being offered this same salary.

121.    Jennifer Loupee began work as an assistant principal. However, nothing about her job actually changed at all. She was still doing the exact same work, responsibilities, and duties that she had been performing at a lesser salary as an academic dean. She was still performing the same functions of evaluating teachers at the school, and was still in charge of the school building whenever the male principal was not present at the school. Absolutely nothing changed about her job or responsibilities, despite the promotion to being an assistant principal.

122.    Early on, it was clear to Jennifer Loupee that she was not being fairly compensated, and that there were men who were making much more money in ECS despite having equal jobs, equal performance, and equal responsibilities as she did. However, Jennifer Loupee's goal was to advance her career and someday become an elementary school principal. She attempted to simply keep her head down and deal with the situation without rocking the boat too much on the blatant and well-known issues with the gender pay gap.

123.    During her year as an assistant principal, both Jennifer Loupee and Stephanie Kimmerly were assigned salaries of $62,280.00. Stephanie Kimmerly had twelve years (12) of experience, and Jennifer Loupee had nine (9) years of experience.

36

124.    There were numerous male assistant principals during the years surrounding this that were compensated far more than Jennifer Loupee, despite the fact that they performed equal jobs, with equal amounts of skill, effort, and responsibility. In 2015, M.L. was a male assistant principal with sixteen (16) years of experience, and he was paid $89,315.00. In 2016, M.L. made $91,780.00.  In 2017, the same year Jennifer Loupee was an assistant principal, with nine (9) years of experience, males K.B. and E.C. had twenty-one (21) and seven (7) years of experience respectively, showing both more and less experience than Jennifer Loupee. Both males made more than her, with K.B. making $68,505.00, and E.C. making $71,935.00.

125.    Perhaps most concerning for Jennifer Loupee was the fact that she later learned that not only was ECS's administrative salary structure essentially determined on a whim as opposed to real factors, but it was not even *followed* by ECS. The administrative salary schedule that was purportedly relied upon for setting administrative salaries mandated back in 2011 that the lowest an assistant principal could be paid was $70,795.00. Jennifer Loupee made $8,515.00 *less* during her year as an assistant principle than the administrative salaries schedule would have afforded her at a minimum nearly a decade before.

126.    This confirmed to Jennifer Loupee that the administrative salaries schedule was not something that was really defined, relied upon, or used as anything other than a pretext to satisfy the whims of the many male administrators that dominated the upper echelons of the ECS administration, and who largely controlled compensation for administrators.

127.    Jennifer Loupee continued to attempt to keep her head down, but a vocal minority of female administrators began to openly talk about and complain about the discrepancies in pay between male and female administrators. On multiple occasions, Jennifer Loupee spoke out about these problems to administrators within ECS.

128.    In March of 2018, Jennifer Loupee interviewed for and accepted a position as an elementary school principal at another school district. That district had a comprehensive salary schedule that was easily articulated to her, and provided her with a clear and comprehensive understanding of how her salary would be calculated, and on what factors would be involved.

129.    At her exit interview in the Spring of 2018, without any further need to keep her head down or to avoid rocking the boat, Jennifer Loupee met with several administrators. At that meeting, she made it clear that she believed that there was a serious and long-term issue that existed at ECS in relation to the disparities in pay that were provided to male and female administrators. She openly criticized this sexual discrimination, and explained numerous ECS employees were aware of this gender pay gap, and that she believed many were scared to come forward to address the concerns. She implored them to do something to fix this problem.

130.    After her exit interview, Jennifer Loupee moved on to another school district in order to continue to improve and build upon her career as a female elementary school administrator.

### 6. Comparisons of Numerous Equal Jobs without Equal Pay

131.    Beyond the individual stories referenced by the Plaintiffs, evaluation and comparison over the past several years confirms that unequal pay based upon gender was a pervasive situation. Numerous women did substantially the same jobs and work as men, but were paid less to do it.

132.    In 2015, J.C. was a female Director of Elementary Instruction. B.K. was a male Director of Secondary Instruction. The positions were substantially equal jobs, requiring equal effort, skill, and responsibility. J.C. directed the curriculum for fourteen (14) schools, while B.K. directed the curriculum of five (5) schools. J.C. had experience as a school principal, while B.K.

had none. Both J.C. and B.K. had master's degrees. J.C. had thirty-two (32) years of experience, while B.K. had twenty (20) years of experience. J.C. made $97,315.00, while B.K. made $110,640.00.

133.    In 2015, M.T. was a female elementary principal. J.N., J.L., and K.B. were all male elementary principals. The positions were substantially equal jobs, requiring equal effort, skill, and responsibility. All of these principals had master's degrees. M.T. had fifteen (15) years of experience. J.N. had twelve (12) years of experience, J.L. had thirteen (13) years of experience, and K.B. had twenty-one (21) years of experience. J.L. and and K.B. led building with some of the smallest student populations in the district. M.T. only made $90,780.00, while J.N., J.L., and K.B. all made $97,315.00.

134.    In 2015, T.K., H.C., and C.H. were female elementary assistant principals. M.L. was a male elementary assistant principal. The positions were substantially equal jobs, requiring equal effort, skill, and responsibility. All of these assistant principals had master's degrees. T.K. had eight (8) years of experience, H.C. had eleven (11) years of experience, and C.H. had nineteen (19) years of experience. M.L. had sixteen (16) years of experience. T.K., H.C., and C.H. only made $61,200.00, while M.L. made $89,315.00. Not only were the female administrators paid less than a substantially equal male, but they were actually paid roughly $8,800.00 *less* than what ECS's administrative salary classification system would have paid them back in 2011.

135.    In 2016, J.C. was the Director of Elementary Instruction. B.K. was a male Director of Secondary Instruction. The positions were substantially equal jobs, requiring equal effort, skill, and responsibility. J.C. directed the curriculum for fourteen (14) schools, while B.K. directed the curriculum of five (5) schools. J.C. had previous experience as a school principal.

39

B.K. had never been a school principal. J.C. and B.K. both had master's degrees. J.C. had thirty-three (33) years of experience, while B.K. only had twenty-one (21) years of experience. J.C. made $100,000.00, while B.K. made $113,695.00.

136.    In 2016, K.C., J.B., and M.T. were all female elementary principals. J.N., J.L., and K.B. were all male elementary principals. The positions were substantially equal jobs, requiring equal effort, skill, and responsibility. All of these principals had master's degrees. K.C. had thirteen (13) years of experience, J.B. had twenty-eight (28), and M.T. had sixteen (16) years of experience. J.N. had thirteen (13) years of experience, J.L. had fourteen (14), and K.B. had twenty-two (22) years of experience. K.C. led a school with one of the largest student populations in the district. J.L. and K.B. led schools with some of the smallest student populations in the district. Females K.C. and J.B. made $93,285.00, and female M.T. made $96,560.00. Males J.N., J.L., and K.B. all made $100,000.00.

137.    In 2016, J.H., S.E., C.T., T.K., C.H., and H.C. were all female elementary assistant principals. M.L. was a male elementary assistant principal. The positions were substantially equal jobs, requiring equal effort, skill, and responsibility. All of these principals had master's degrees. J.H. had twenty-three (23) years of experience, S.E. had thirteen (13), C.T. had sixteen (16), T.K. had nine (9), and C.T. had twenty (20) years of experience. M.L. had seventeen (17) years of experience. J.H. made $71,935.00, S.E. and C.T. made $67,825.00, T.K. made $78,990.00, and C.H. made $67,825.00. Female H.C. made $89,040.00. Male M.L. made $91,780.00.

138.    In 2017, Tara White was the female Director of Literacy, a new title that combined both the position of Coordinator of Media Services & Digital Resources, in addition to the duties of Director of Elementary Instruction. In the previous year, those positions

40

independently would have paid $75,280.00 and $100,000.00 respectively if two people were performing those jobs. B.K. was a male Director of Secondary Instruction. Both Tara White and B.K. had master's degrees and administrator's licenses. The positions of Director of Elementary Instruction and Director of Secondary Instruction were substantially equal jobs, requiring equal effort, skill, and responsibility, with the exception that Tara White's additional responsibilities from the combination of jobs into the position of Director of Literacy left her with far more job responsibilities. Tara White directed the curriculum of fourteen (14) schools, as well as twenty (20) district libraries. B.K. directed the curriculum of five (5) schools. Tara White had two direct report employees to supervise and evaluate, while B.K. had none. Neither had ever been a building principal. Tara White had seventeen (17) years of experience, while B.K. had twenty-two (22) years of experience. Tara White made $92,000.00, and received twenty (20) vacation days. B.K. made $114,835.00.

139.    In 2017, K.C., J.B., and M.T. were all female elementary principals, along with T.K., who had recently been promoted from an assistant principal position. J.N., J.L., and K.B. were all male elementary principals, along with M.L., who had recently been promoted from an assistant principal position. The positions were substantially equal jobs, requiring equal effort, skill, and responsibility. All of these principals had master's degrees. K.C. had fourteen (14) years of experience, J.B. had twenty-nine (29), M.T. had seventeen (17), and T.K. had ten (10) years of experience. Males J.N. had fourteen (14) years of experience, J.L. had fifteen (15), K.B. had twenty-three (23) years, and M.L. had eighteen (18) years of experience. Female K.C. led a school with one of the largest student populations in the district. Males J.L. and K.B. led schools with some of the smallest student populations in the district. Females K.C. made $93,690.00, J.B. made $94,220.00, M.T. made $97,525.00, and first-year female principal T.K. made

$91,690.00. Males J.N., J.L., and K.B. all made $101,000.00, while first-year male principal M.L. made $96,360.00.

140.    In 2017, Stephanie Kimmerly, Jennifer Loupee, C.H were all female elementary assistant principals. K.B. and E.C. were male elementary assistant principals. The positions were substantially equal jobs, requiring equal effort, skill, and responsibility. All had master's degrees. Stephanie Kimmerly had twelve (12) years of experience, Jennifer Loupee had nine (9), and C.H. had twenty-nine (29) years of experience. K.B. had twenty-one (21) years of experience, and E.C. had seven (7) years of experience. Stephanie Kimmerly and Jennifer Loupee were paid $62,280.00, while C.H. was paid $67,825.00. Males K.B. was paid $68,505.00, and E.C. was paid $71,935.00.

141.    In 2018, Tara White was the female Director of Literacy, a new title that combined both the position of Coordinator of Media Services & Digital Resources, in addition to the duties of Director of Elementary Instruction. P.L. was a male Director of Secondary Instruction, a position that was edited to mirror exactly the work and responsibilities of the Director of Literacy, and evaluations compared these positions as equal. Both Tara White and P.L. had master's degrees and administrator's licenses. The positions of Director of Literacy and Director of Secondary Instruction were substantially equal jobs, requiring equal effort, skill, and responsibility, with the exception that Tara White's additional responsibilities from the combination of jobs into the position of Director of Literacy left her with far more job responsibilities. Tara White directed the curriculum of fourteen (14) schools, as well as twenty (20) district libraries. P.L. directed the curriculum of six (6) schools. Tara White had three direct report employees to supervise and evaluate, while P.L. had none. Tara White oversaw and managed a $250,000.00 annual media services budget. P.L. did not oversee any budgets. Tara

White had eighteen (18) years of experience, while P.L. had thirty-seven (37) years of experience. Tara White made $92,920.00, and P.L. made $108,980.00.

142.    In 2018, an additional comparison to equivalent work can be made from Tara White, the female Director of Literacy, and W.M., a male District Coordinator of Technology Integration. The position are substantially equal jobs, requiring equal effort, skill, and responsibility, with the exception that Tara White's responsibilities are far broader. Tara White oversees her former responsibilities as Coordinator of Media Services & Digital Resources. She directs the curriculum of fourteen (14) elementary schools, while overseeing the programming of twenty (20) libraries throughout the district. W.M. oversees the professional development for teachers on the use of iPads. Tara White oversees a $250,000.00 annual budget for media services, while W.M. does not oversee any budgets. Tara White has a master's degree and an administrator's license, while W.M. had neither. Tara White has eighteen (18) years of experience, while W.M. has only twelve (12). Tara White and W.M. both make the same amount of $92,920.00. Tara White was not allowed to negotiate her compensation, and was not allowed to negotiate her vacation days above the offered twenty (20). W.M. was allowed to negotiate his contract with the Superintendent. While the Superintendent did not allow W.M. to negotiate his salary, he did allow him to negotiate his vacation days up from the offered amount of twenty (20) up to twenty-five (25). Additionally, W.M. was allowed to negotiate his contract to make him eligible for quarterly bonuses throughout the year based on the number of iPads rolled out.

143.    In 2018, T.K., H.C., K.C., and J.B. were female elementary principals. J.N., J.L., and M.L. were all male elementary principals. The positions were substantially equal jobs, requiring equal effort, skill, and responsibility. All of these principals had master's degrees. T.K. had eleven (11) years of experience, H.C. had fourteen (14), K.C. had fifteen (15), and J.B.

had thirty (30) years of experience. Males J.N. had fifteen (15) years of experience, J.L. had sixteen (16) years, and M.L. had nineteen (19) years of experience. T.K. was paid $91,690.00, H.C. was paid $93,285.00, and K.C. and J.B. were paid $94,220.00. Males J.N. and J.L. were paid $101,000.00, while M.L. was paid $96,360.00.

144.    In 2018, N.S. and C.L. were female elementary assistant principals. K.B. was a male elementary assistant principal. The positions were substantially equal jobs, requiring equal effort, skill, and responsibility. All of these assistant principals had master's degrees. N.S. had thirteen (13) years of experience, and C.L. had eleven (11) years of experience. K.B. had twenty-four (24) years of experience, but had recently been demoted from an elementary principal position. N.S. made $66,450.00, while C.L. made $68,680.00. Male K.B. performed the same job as these women, but was paid $101,000.00.

## V.  Causes of Action

### Count I – Violations of Equal Pay Act Pursuant to Title 29 U.S.C. § 206(d)

### On Behalf of Plaintiffs and all Collective Action Members

145.    The conduct of ECS as described within this Complaint shows that ECS has discriminated against the Plaintiffs and Collective Action Members in violation of the Equal Protection Act, located at 29 U.S.C. § 206(d).  ECS had maintained or allowed policies and procedures for numerous years which have regularly and routinely forced the female Plaintiffs and Collective Action Members that work within its administration to perform equal jobs with equal skill, effort, and responsibility as to similarly situated males, but has refused to provide them with equal pay for those efforts.

146.    The combined effect is a pervasive culture at ECS that degrades and devalues the work of female administrators, while simultaneous making it harder for women to climb the

rungs of a career ladder that shows blatant preference for male employees. Male employees are provided with opportunities to negotiate for better compensation and benefits, while female employees are denied the same privileges and forced to accept what they are offered.

147.   That while ECS purports to have a classification system to determine salary to administrative employees, that classification system is nothing more than a never-completed and never-followed farce which simply provided cover to allow for wide-spread pay gaps to be generated between female and male employees. ECS has for years had no system in place to determine the proper salaries of positions beyond the whims and wishes of the disproportionately male dominated leadership of the school corporation.

148.   The Plaintiffs and Collective Action Members all performed work that was substantially equal to the jobs of male employees.

149.    The Plaintiffs and Collective Action Members all performed jobs under similar working conditions as their male counterparts.

150.   That ECS paid the Plaintiffs and Collective Action Members less money than male employees for doing substantially equal work, with substantially equal skill, effort, and responsibility.

151.   That the differential in pay between male and female employees is due to gender, and not to any rationale or explainable factor such as seniority, merit, quantity, or quality of production.

152.   That despite numerous complaints regarding this gender wage gap problem, ECS has responded by dismissively ignoring the problem completely, and attempting to retaliate, punish, run-off, or fire any female Collective Action Members who are brave enough to demand equal treatment. These efforts to willfully avoid ECS's systemic problems, and to retaliate

against those who do complain, constitutes a failure to act in good faith, and has caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the EPA within the meaning of 29 U.S.C. § 255(a). By willfully violating the EPA, a three-year statute of limitations applies to the claims of the Plaintiffs and the Collective Action Members.

153.    The Plaintiffs, as well as all Collective Action Members, have all suffered damages as a result of the illegal policies and procedures ECS maintains in violation of the Equal Protection Act, in an as yet unknown amount, in the form of, but not limited to, lost past and future income, front pay, back pay, compensation, and other benefits.

**Prayer for Relief**

Wherefore, the Plaintiffs, individually and on behalf of the Collective Action Members, respectfully requests this Court to:

a.      Certify this action as a collective action under the EPA on behalf of Plaintiffs and the Collective Action Members;

b.      Designate Plaintiffs as the representatives of the Collective Action Members;

c.      Promptly issue notice pursuant to 29 U.S.C. § 216(b) to all similarly situated Collective Action Members, which (1) apprises them of the pendency of this action and (2) permits them to assert timely EPA claims in this action y filing individual Consent to Join as Party Plaintiff forms pursuant to 29 U.S.C. § 216(b);

d.      Toll the statute of limitations on the claims of all Collective Action Members from the date the original Complaint was filed until the Collective Action Members are provided

with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt-in to the Collective Action;

e.        A declaratory judgment that the practices complained of herein are unlawful, unconstitutional, and violate 29 U.S.C. § 216(b);

f.        A grant of equitable relief in the form of an order that ECS institute and carry out policies, practices, and programs that provide equal employment opportunities for all employees regardless of gender, and that it eradicate the effects of their past and present unlawful employment practices;

g.        A grant of equitable relief in the form or an order that ECS develop and institute reliable, validated, and job-related standards for evaluating performance, determining pay, and making promotion decisions in relation to the Collection Action Members;

h.        Award Plaintiffs and Collective Action Members compensatory damages for harms that they have suffered as a result of ECS's unlawful conduct, in the form of back pay for up to threes from the filing of the suit, pursuant to 29 U.S.C. § 216(b) and 29 U.S.C. § 255(a);

i.        For an award of liquidated damages pursuant to 29 U.S.C. § 216(b) and (c);

j.        For an award of pre-judgment and post-judgment interest, as may be appropriate;

k.        For an award of attorney's fees and reasonable expenses incurred in this litigation, including reasonable attorney and expert fees, pursuant to 29 U.S.C. § 216(b);

l.        For any and all other further and general relief to which the Plaintiffs and Collective Action Members may be entitled; and

m.        For the costs of this action.

## JURY DEMAND

With respect to the allegations set forth above, the Plaintiffs requests a trial by jury.

Respectfully submitted,

 /s/ Bradley P. Colborn
Michael P. Misch (27970-71)
Bradley P. Colborn (28501-20)
Anderson • Agostino & Keller, P.C.
131 South Taylor Street
South Bend, Indiana 46601
Telephone: (574) 288-1510
Facsimile: (574) 2881650
Email: misch@aaklaw.com
Email: colborn@aaklaw.com

48