UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| TARA WHITE, <br><br> Plaintiff, <br><br> v. <br><br> ELKHART COMMUNITY SCHOOLS, <br><br> Defendants. | CAUSE NO. 3:19-CV-64 DRL |

OPINION AND ORDER

Elkhart Community Schools (ECS) employed Tara White as its director of literacy from July 2017 to August 2023. She claims that she was paid less than her male colleagues in violation of the Equal Pay Act (EPA), 29 U.S.C. § 206. ECS requests summary judgment. The court denies the motion.

BACKGROUND

Ms. White began her employment with ECS as the coordinator for media services in January 2016 [105-2 ¶ 4]. At the time of her hire, she had over fifteen years working in education, a master's degree in school administration and secondary education, a certification in library science and information technology, an Indiana Professional Educator's License, a certification in secondary administration and supervision, and other accolades [111-1, 11-2]. At the end of the 2016-2017 school year, ECS created a director of literacy position and appointed Ms. White to fill it [111-8 ¶ 6]. Dr. Rob Haworth, then-superintendent, stated that literacy was ECS's number one priority [*id.* ¶ 9].

At the same time ECS created the position, the Director of Elementary Education Jean Creasbaum announced her retirement [*id.* ¶ 8]. Dr. Dawn McGrath, who served as the deputy superintendent at the time, suggested that ECS consolidate the director of elementary instruction position into the newly created director of literacy position [*id.*]. At Dr. McGrath's instruction, Ms. White created a proposal outlining the job duties, also requesting a salary of $104,000.00 and twenty-

five vacation days [111-12 ¶ 9]. She was told that, pursuant to the ECS class system for administrator pay, her position could not make more than $93,000.00 [*id.* ¶¶ 10-11].

In the initial appointment of the director of literacy position to human resources, Dr. Haworth handwrote a question mark next to the field for "Class" [111-4]. On June 27, 2017, he initialed a typewritten memorandum that listed the position as Class IV [111-5]. Sometime later, the position was listed in ECS's system as Class III [105-2 ¶ 24]. At that time, Class III positions could only make up to $92,484.00 [*id.* ¶ 13]. Class IV positions could make up to $107,898.00 [*id.*]. In December 2017, that increased to $93,409.00 and $108,977.00 respectively [*id.* ¶ 14].

Ms. White was ultimately offered and accepted a salary of $92,000.00 and twenty vacation days, and she was told that she could not negotiate [111-12 ¶ 11]. Dr. McGrath says that Ms. White competently performed her duties as the director of elementary instruction during the 2017-2018 school year [111-8 ¶ 13]. No one else was appointed to the role during this time [*id.*]. Ms. White received excellent evaluations [*id.* 21 (Ex. 3)].

During this same school year, William Kovach served as ECS's director of secondary instruction (or secondary curriculum) [*id.* ¶ 16]. Dr. McGrath supervised Mr. Kovach [*id.* ¶ 15]. She says Mr. Kovach and Ms. White's positions directly paralleled each other [*id.* ¶¶ 21-22]. Mr. Kovach had been in this position since 2016 and had signed a contract for the period July 2016 through July 2019 at $110,640.00 annually [105-2 ¶ 35]. He signed a new contract on August 1, 2017 for an annual salary of $113,695.00 and twenty-five vacation days [*id.* ¶ 36]. On January 12, 2018, his salary increased to $114,835.00 when he signed another new contract [*id.*]. Mr. Kovach resigned after the 2017-2018 school year [111-8 ¶ 20]. Dr. McGrath says that he struggled in his role [*id.* ¶¶ 16, 19-20]. After his resignation, Dr. McGrath mirrored the job description of the director of secondary instruction to reflect Ms. White's duties [*id.* ¶ 20].

2

Phil Lederach replaced Mr. Kovach in July 2018 as the director of secondary instruction [105-2 ¶¶ 48-49]. Mr. Lederach's job description was based on Ms. White's job duties [111-8 ¶ 20]. Mr. Lederach held the position until he resigned in 2020, at which time the position was eliminated [105-3 ¶¶ 14, 20-21]. At the time of his hire, he received $108,980.00 and twenty vacation days [105-2 ¶ 49].

Dr. Robert Woods was hired as the director of elementary instruction in July 2018 [105-1 ¶ 6]. His salary for the period July 1, 2018 through June 30, 2020 was $110,685.00 [*id.*] He was previously employed at ECS as the director of business operations and his compensation did not increase when he was transferred [*id.* ¶¶ 5-6].

The director of secondary instruction position held by Mr. Kovach and Mr. Lederach was Class V [*id.* ¶ 26; 105-2 ¶ 34]. As of 2018, Class V positions could make up to $129,735.00 [105-2 ¶ 14]. The record does not indicate what class the director of elementary instruction position was.

Wes Molyneaux was hired to serve as the coordinator of technology integration for the 2016-2017 school year [*id.* ¶ 38]. In December 2016, ECS made Mr. Molyneaux an administrator and gave him a new title, director of instructional technology [*id.* ¶ 44]. In August 2017, Mr. Molyneaux signed a contract for an annual salary of $92,000 and twenty-five vacation days [*id.* ¶ 62]. His duties centered on technology rollout and integration [*id.* ¶ 43]. This was a Class III position [105-1 ¶ 28].

In September 2018, ECS became concerned "about the equity and fairness" of the class system used to set the salaries of its administrators [111-6 Tr. 46]. Superintendent Mark Mow established an Administrative Salaries Committee to discover and address potential issues [111-12 ¶ 41]. Ms. White was appointed to be a member of the committee [*id.* ¶ 40]. One concern was that there were potential discrepancies based on gender that could be legally actionable [*id.* ¶ 41]. Another concern was that Dr. Haworth ultimately had sole control over class designations [111-7 Tr. 28]. The committee presented findings indicating there may have been a gender pay gap [111-12 ¶ 44]. At one meeting of the committee, District Counsel W. Douglas Thorne stated that "women just aren't as good at negotiating

3

their contracts as men" [*id.* ¶ 43]. Mr. Mow later hired a subconsultant to address administrator compensation and disbanded the committee [105-1 ¶¶ 17-18].

In November 2018, Ms. White met with Mr. Mow to discuss a salary increase, as she was concerned that she was not receiving equal pay for equal work [111-12 ¶ 47]. Mr. Mow did not make any adjustments to her compensation [105-1 ¶ 22]. Ms. White submitted a complaint for discrimination pursuant to ECS policy on December 21, 2018 [*id.* ¶ 23]. She then filed suit on January 31, 2019 [1]. Ms. White served as director of literacy until she resigned in August 2023 [105-5 ¶ 6].

## STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in his favor. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022). The court must construe all facts in the light most favorable to the non-moving party, viewing all reasonable inferences in that party's favor, *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant a summary judgment motion when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

4

DISCUSSION

The EPA prohibits wage discrimination "between employees on the basis of sex" when such employees perform "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). "The [EPA] creates a type of strict liability in that no intent to discriminate need be shown." *Patkus v. Sangamon-Cass Consortium*, 769 F.2d 1251, 1260 n.5 (7th Cir. 1985); *see also Ledbetter v. Goodyear Tire & Rubber Co. Inc.*, 550 U.S. 618, 641 (2007) (no requirement of intentional discrimination under EPA).

A plaintiff alleging an EPA claim bears the initial burden of establishing a *prima facie* case of wage discrimination. *Warren v. Solo Cup Co.*, 516 F.3d 627, 629 (7th Cir. 2008). Ms. White must show that "(1) higher wages were paid to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions." *Id.* (quoting *Stopka v. All. of Am. Insurers*, 141 F.3d 681, 685 (7th Cir. 1998)); *see also Rongere v. City of Rockford*, 2024 U.S. App. LEXIS 10462, 10 (7th Cir. Apr. 30, 2024).

If she establishes a *prima facie* case, the burden shifts to the school to offer a gender-neutral justification for the unequal pay. *Warren*, 516 F.3d at 630. The EPA permits a defendant to use one of four potential explanations for the pay disparity: "a seniority system, a merit system, a system which measures earning by quantity or quality of production, or a differential based on any factor other than sex." *Patkus*, 769 F.2d at 1260 (citing 29 U.S.C. § 206(d)(1)(i)-(iv)). "An employer asserting that the difference is the result of a 'factor other than sex' must present this contention as an affirmative defense—and the proponent of an affirmative defense has the burdens of both production and persuasion." *King v. Acosta Sales & Mktg.*, 678 F.3d 470, 474 (7th Cir. 2012).

ECS does not contest that Ms. White was paid less than Mr. Kovach, Mr. Lederach, and Dr. Woods, or that she received five fewer vacation days than Mr. Molyneaux, which ECS acknowledges is a pay differential. ECS initially frames its concern with the other two elements, but the school only

develops an argument as to the second one—whether Ms. White performed work requiring substantially similar skill, effort, and responsibilities as each comparator. ECS foregoes developing an argument that Ms. White never worked under similar conditions as her comparators, all administrators in the same school district. The court thus confines its analysis to whether Ms. White performed equal work requiring substantially similar skill, effort, and responsibilities as each comparator.

A. *Equal Work.*

To determine whether two jobs are equal under the EPA, the "crucial inquiry is 'whether the jobs to be compared have a 'common core' of tasks, i.e., whether a significant portion of the two jobs is identical.'" *Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 699 (7th Cir. 2003) (quoting *Fallon v. Illinois*, 882 F.2d 1206, 1209 (7th Cir. 1989)). If the plaintiff establishes that the two jobs have a "common core," the court then inquires "whether any additional tasks make the jobs 'substantially different.'" *Id.* A "slight difference" will be "unpersuasive as a distinction between the jobs." *Fallon*, 882 F.2d at 1209. But two jobs may be rendered substantially different if, for example, a comparator spends a significant amount of time on additional duties that require greater skills or qualifications. *See, e.g., David v. Bd. of Trs.*, 846 F.3d 216, 230 (7th Cir. 2017) (significant software development and implementation duties that required bachelor's degree rendered job substantially different from software security analyst position). Simply identifying one or two additional responsibilities without explaining how they make a comparator's job substantially different will not warrant summary judgment. *See Melgoza v. Rush Univ. Med. Ctr.*, 499 F. Supp.3d 552, 567-68 (N.D. Ill. 2020) (denying summary judgment when the defendant did not "explain how" or "provide[] any evidence" that the additional tasks actually made comparator's job substantially different and so the court could make the determination on the record).

The EPA specifies three elements for consideration: required skill, effort, and responsibility. 29 U.S.C. § 206(d)(1). "It should be kept in mind that 'equal' does not mean 'identical.' Insubstantial

or minor differences in the degree or amount of skill, or effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable." 29 C.F.R. § 1620.14(a); *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 203 n.24 (1974) ("it is now well settled that jobs need not be identical in every respect before the Equal Pay Act is applicable").

      1. *William Kovach.*

Ms. White proposes Mr. Kovach as a comparator. Mr. Kovach was a male administrator who served as ECS's director of secondary instruction during the 2016-2017 and 2017-2018 school years [105-2 ¶¶ 35-36]. ECS first points to the difference in titles between Mr. Kovach and Ms. White. But the jobs compared must be substantially equal "based upon actual job performance and content—not job titles, classifications or descriptions." *Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 913 (7th Cir. 2002) (quotations omitted).

Ms. White asserts that after becoming the director of literacy at the start of the 2017 school year, she assumed the responsibilities of the director of elementary instruction position and thus shared a common core of responsibilities with Mr. Kovach. Former Deputy Superintendent Dr. Dawn McGrath supervised both Ms. White and Mr. Kovach [111-8 ¶¶ 3, 15]. Dr. McGrath says she consolidated the duties of the two director positions at the end of the 2016-2017 school year after the retirement of former director of elementary instruction, Jean Creasbaum [*id.* ¶ 8]. She says during the 2017-2018 school year Ms. White competently performed this position's duties, though neither she nor anyone else received the formal title [*id.* ¶ 13]. Dr. McGrath adds that Mr. Kovach's role as director of secondary instruction paralleled Ms. White's so closely that, when updating the job description upon his resignation in 2018, she intentionally mirrored Ms. White's duties [118-8 ¶¶ 21-22].

ECS contests this without providing evidence to the contrary, arguing instead that Ms. White is asking the court to assume that she performed the responsibilities of the director of elementary instruction beginning July 2017 and that the position is equal to the director of secondary instruction.

At summary judgment, the court must construe facts in the light most favorable to Ms. White as the non-moving party and view reasonable inferences in her favor. *Bigger*, 947 F.3d at 1051. Ms. White has marshaled a factual record that permits a reasonable jury to find in her favor—namely, a triable issue regarding her assumption of the director of elementary instruction duties and their similarity to the director of secondary instruction position. A reasonable jury could find that she and Mr. Kovach shared a common core of responsibilities.

Having determined that a reasonable jury could find a common core of tasks between Ms. White's and Mr. Kovach's positions, the court now asks "whether any additional tasks make the jobs 'substantially different.'" *Cullen*, 338 F.3d at 698. ECS argues that Mr. Kovach had additional responsibilities that rendered his job substantially different from Ms. White's performance. First, Superintendent Haworth says he consulted Mr. Kovach on evaluations of secondary building administrators and did not similarly consult Ms. White about elementary building administrators [105-2 ¶¶ 28, 34]. But Dr. McGrath, Mr. Kovach's direct supervisor, says the evaluation of principals was "not a part of [Mr. Kovach's] job description and not his responsibility," and his performance evaluations make no mention of this task [111-8 ¶¶ 15-17]. Something merely discretionary or *ad hoc* by the superintendent but not a component of expected duties a reasonable jury could disregard on this record.

ECS maintains that Ms. White's evidence is nothing more than self-serving, speculative statements about her beliefs and opinions (and those of former ECS Deputy Superintendent Dr. Dawn McGrath). Unsubstantiated self-serving statements may be one thing, but independently corroborated statements are not problematic merely because they permit an inference that favors one party. For instance, Dr. McGrath's affidavit is not self-serving or speculative. And even "self-serving assertions to the contrary by the nonmoving party may be sufficient to create a credibility dispute [that] is best resolved at trial," *Szymanski v. Rie-Way Lawn Maint. Co.*, 231 F.3d 360, 365 (7th Cir. 2000),

and that is the case here. The jury will decide the weight to give each witness's testimony. The school has not identified substantial differences in responsibility. "[T]o argue that *any* difference in supervisory responsibility renders jobs unequal is manifestly incorrect as a matter of law." *Fallon*, 882 F.2d at 1209 (quotations and citation omitted). Even if Mr. Kovach contributed to Dr. Haworth's secondary principal evaluations, the record is silent about what measure of additional responsibility, skill, or effort this required.

ECS next argues that Mr. Kovach had "two significant projects" that went beyond Ms. White's job duties: (1) responsibility for integrating career pathways, and (2) alumni and community relations responsibilities. Dr. McGrath says the integration of career pathways was her primary responsibility and that Mr. Kovach had to be removed from implementing the project in the secondary curriculum due to poor performance [111-8 ¶¶ 18-19]. Further, she says Ms. White successfully led the same program in the elementary curriculum [*id.*]. That tends to underscore a triable issue rather than obviate one. Though Ms. White does not dispute that Mr. Kovach performed some alumni responsibilities, ECS again provides no insight about the extent, frequency, or responsibilities of this work as compared to his core responsibilities as director of secondary instruction, particularly when they were seemingly short-lived. *See, e.g., Boyd v. City of Chi.*, 2023 U.S. Dist. LEXIS 90744, 11-12 (N.D. Ill. May 24, 2023) (finding that additional task made job substantially different when it took 30-35 percent of comparator's time outside of common core and required different skill set).

On this record, ECS is not entitled to judgment as a matter of law. Ms. White has established a genuine triable issue whether she and Mr. Kovach shared a common core of responsibilities, but one received more pay than the other. Only the jury can assess credibility or weigh the evidence, so the court must deny summary judgment.

9

2. *Dr. Robert Woods.*

Ms. White offers Dr. Woods as another comparator. Dr. Woods was appointed as the director of elementary instruction in July 2018 [105-1 ¶¶ 4-7]. Though Dr. Woods had extensive experience in education, his most recent role before this appointment was as director of business operations at ECS [*id.* ¶¶ 4-5]. Ms. White contends that Dr. Woods came to her for assistance because he had been "out of the loop" and "desperately needed [her] assistance to catch up on the current curriculum" [111-12 ¶ 23]. She asserts that she was tasked by the new superintendent, Mark Mow, with providing a list of duties she performed as director of elementary instruction [*id.* ¶¶ 26-27]. These duties were then split or shared between Ms. White and Dr. Woods [*id.* ¶ 27]. Ms. White says she was instructed to "work through" Dr. Woods to teach him what he needed to know while retaining the majority of the responsibilities [*id.*].

ECS argues that, even if this division of shared and retained responsibilities is accurate, Ms. White effectively concedes she and Dr. Woods were not performing a common core of tasks after his appointment. But "differences in skill, effort or responsibility which might be sufficient to justify a finding that two jobs are not equal within the meaning of the EPA . . . do not justify such a finding where the greater skill, effort, or responsibility is required of the lower paid sex." 29 C.F.R. § 1620.14. And, if Dr. Woods in fact took over all director of elementary instruction duties, he simply would have been Ms. White's successor. The proper comparison would then be between Dr. Woods's 2018-2019 duties and Ms. White's 2017-2018 duties. "The salary paid to a successor who performs substantially the same work may provide a basis for an equal pay action." *Patkus*, 769 F.2d at 1260. Drawing all reasonable inferences in Ms. White's favor, a reasonable jury could find that she shared a common core of responsibilities with Dr. Woods, either simultaneously or as his predecessor.

ECS next argues that Mr. Mow assigned Dr. Woods the additional responsibility of supervising and evaluating elementary principals, and this rendered their jobs substantially different. ECS says Mr.

10

Mow considered this "the most important function of that position," and that as a result Ms. White did not perform work requiring equal skill, effort, and responsibility. As support, ECS offers two sentences in Mr. Mow's declaration, backed by a 2014 job posting that does not seem to mention the evaluation of elementary principals [105-1 ¶ 7; *id.* PDF 20 (Ex. 4)].

The record permits a reasonable jury to view the jobs as less than substantially different. In fairness, Ms. White never disputes that Dr. Woods evaluated elementary principals. Whether this single task under Mr. Mow was so significant as to render their jobs substantially different, particularly when it was not listed on the job descriptions or in the evaluations [112 ¶ 55], and when the record remains barren as to the time, skill, or effort put by Dr. Woods to this important task, remains a triable issue. That Mr. Mow viewed the task as important is something, but alone unworthy of calling the positions substantially different as a matter of law. In short, the record still permits a reasonable jury to find Dr. Woods a proper comparator.

Finally, ECS argues that Dr. Woods is not a proper comparator because he had more years of experience than Ms. White and a doctorate in personnel management. This misses the mark a bit. The EPA "looks to the similarity of the actual duties involved, and does not turn on differences in job descriptions, prior training, or other factors." *Patkus*, 769 F.2d at 1260 (district court improperly granted summary judgment based on the higher educational qualifications of a proposed comparator). "[T]he comparison at [the *prima facie*] juncture is between positions, not individuals." *Cullen*, 338 F.3d at 699 (finding that different educational credentials would not preclude *prima facie* case); *see also* 29 C.F.R. § 1620.15(a) ("Possession of a skill not needed to meet the requirements of the job cannot be considered in making a determination regarding equality of skill."). Accordingly, the court must deny summary judgment for ECS.

3. *Phil Lederach.*

Ms. White identifies Phil Lederach as her third comparator. Mr. Lederach was hired as the director of secondary instruction to replace Mr. Kovach in 2018 [105-2 ¶ 49]. Mr. Lederach held the position until he resigned in 2020, at which time the position was eliminated [105-3 ¶¶ 14, 20, 21]. Dr. McGrath says she created the job description for this position when Mr. Lederach was hired based on Ms. White's duties [111-8 ¶¶ 21-22]. As discussed, Ms. White has established genuine triable questions whether she performed the duties of the director of elementary instruction and the relationship between that position and the director of secondary instruction. Drawing all reasonable inferences in her favor, a reasonable jury could find that Ms. White shared a common core of responsibilities with Mr. Lederach.

Like with Dr. Woods, ECS effectively argues that beginning in 2018, the most important job for the director of secondary instruction was the supervision and evaluation of secondary principals and that this additional task made the jobs substantially different. Because Ms. White did not have that responsibility, so the argument goes, she and Mr. Lederach did not perform equal work. Ms. White disputes that this additional task was so significant as to render the two positions substantially different. First, she points out that Mr. Lederach's 2019 evaluation makes no reference to it, which draws into some question how important or substantial it really was [111-14]. It was but one of many responsibilities listed by Mr. Lederach [105-6 ¶ 11]. Mr. Mow called it the most important responsibility, but again this record offers no proof of its importance in terms of skill or time or efforts such that a reasonable jury could only find it substantially different.

Last, ECS argues that Mr. Lederach's role in integrating two high schools into one undermines Ms. White's *prima facie* showing. Mr. Mow's replacement as superintendent, Dr. Steven Thalheimer, says Mr. Lederach "played a critical role in the consolidation process" and that it "demanded significant time, attention, and skill drawing on [Mr.] Lederach's unique experiences and skills" [105-

12

3 ¶ 10]. Perhaps this draws closer to the mark, but it remains altogether general. ECS provides no precise information about the specific role Mr. Lederach played, his specific responsibilities related to this project, or his time and skill that were required of him. ECS does not tell the court when this merger took place or even over what period of time. And Ms. White offers evidence of her additional demands, within the same core responsibilities, that a reasonable jury could consider in deciding that Ms. White shared just as much responsibility, if not more at times, than Mr. Lederach. The court cannot say as a matter of law the two positions were substantially different on this record. A reasonable jury could find that Ms. White and Mr. Lederach shared a common core of responsibilities. The court denies summary judgment.

      4. *Wes Molyneaux.*

Ms. White's final proposed comparator is Wes Molyneaux. Mr. Molyneaux was initially hired as the coordinator of instructional technology in 2016 and was made director of instructional technology in December of that year [105-2 ¶¶ 38-42]. Ms. White contends that she and Mr. Molyneaux performed equal work because as director of literacy she was still overseeing the former responsibilities of the coordinator of media services and digital resources. ECS argues that Ms. White has failed to establish that their positions had the requisite common core, and the school is right. Ms. White provides no information about the nature or responsibilities of that role and how they relate to Mr. Molyneaux's position as director of instructional technology. She provides a list of additional responsibilities she had over Mr. Molyneaux, but the common core of responsibilities between her and Mr. Molyneaux is still missing. *See Cullen*, 338 F.3d at 698; *see also Jaburek v. Foxx*, 813 F.3d 626, 633 (7th Cir. 2016) (plaintiff must provide a description of a common core of tasks, not just titles). But because the record otherwise permits a jury to find for Ms. White, the court still must deny summary judgment.

B. *ECS's Gender-Neutral Justifications.*

Because a reasonable jury could find that Ms. White has met her *prima facie* burden with comparators such as Mr. Kovach, Mr. Lederach, and Dr. Woods, the burden now shifts to ECS to prove that the pay differential was based on a gender-neutral factor. As an affirmative defense, the school bears the burden of production and persuasion. *King.*, 678 F.3d at 474. These affirmative defenses can include a seniority system, a merit system, a system that measures earning by quantity or quality of production, or a differential based on any factor other than sex. 29 U.S.C. § 206(d)(1)(i)-(iv).

The justification "need not be a 'good reason,'" but it must be "bona fide." *Warren v. Solo Cup Co.*, 516 F.3d 627, 630 (7th Cir. 2008). This means that "an employer cannot use a gender-neutral factor to avoid liability unless the factor is used and applied in good faith; it was not meant to provide a convenient escape from liability." *Fallon*, 882 F.2d at 1211. The court considers whether the proposed factor "has been discriminatorily applied, and in some circumstances, whether it may have a discriminatory effect." *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1462 (7th Cir. 1994). Defendants must "prove, and not just assert" that the wage difference was actually the result of a "factor other than sex." *King*, 678 F.3d at 474. "An employer's given explanation for a pay discrepancy must be supported by evidence that the employer actually relied on that reason." *Lauderdale v. Ill. Dep't of Hum. Servs.*, 876 F.3d 904, 908 (7th Cir. 2017) (finding that emails, memoranda, and other forms established that defendant actually relied on the factor other than sex in wage setting). "[D]ifference in pay based on the difference in what employees were previously paid is a legitimate" factor. *Id.* The factor other than sex need not be related to the requirements of the particular position. *Covington v. S. Ill. Univ.*, 816 F.2d 317, 322 (7th Cir. 1987).

ECS raises the fourth "catch-all" exception. *See Fallon*, 882 F.2d at 1211. The school says the salaries were a result of the comparators' superior work experience and education. It lists in rote fashion the qualifications and years of experience of each as justification—notably without making

14

any comparisons to Ms. White's education or experience. Certainly "differences in education and experience may be considered factors other than sex," *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 697 (7th Cir. 2006), but ECS provides no evidence that it actually considered these factors when setting salaries, *see King*, 678 F.3d at 474. The closest the school gets is Dr. Haworth's statement that Mr. Lederach was "selected" due to his experience, but not that his pay was set based on that metric [*see* 105-2 ¶ 48]. A mechanical recitation of experience and education does not meet the school's burden.

Second, ECS says Mr. Kovach's and Mr. Lederach's higher salaries were a result of their "additional and weighty responsibilities." "Additional duties may not be a defense to the payment of higher wages to one sex where the higher pay is not related to the extra duties." 29 C.F.R. § 1620.20. Defendants are precluded from using this defense if the plaintiff "also perform[ed] extra duties requiring equal skill, effort, and responsibility." § 1620.20(b). As with experience and education, ECS provides no evidence that these additional duties were considered (or even contemplated) when setting pay at the time each was hired. And, as discussed, there remains a genuine dispute about whether Ms. White performed comparative additional duties.

ECS maintains that Mr. Lederach negotiated a higher salary and left a higher-paying job, so he was paid more. ECS also argues that Mr. Kovach and Dr. Woods were paid more because they had previous salaries that ECS was obligated to maintain. These may be factors other than sex justifying a difference in pay, but the record doesn't close the door on whether they are bona fide reasons. First, Ms. White tried to negotiate a salary increase and was rebuffed, both at the time of her appointment and later in 2018 [105-1 ¶¶ 19-22; 111-12 ¶ 11]. This cannot be appropriately chalked up to the disturbing idea that women simply cannot negotiate just as well as men—more discriminatory in outlook than not, so a reasonable jury could say once this comment has been viewed in the light most favorable to Ms. White.

15

Second, the reliance on previous salaries and contracts does not assuage concerns, as the difference in these previous salaries could also be attributed to a discriminatory system. Nor would it explain why Mr. Kovach was allowed to repeatedly re-execute his contract in the middle of its period for significant salary increases [105-2 ¶¶ 30-36]. This was all the while he was receiving poor performance reviews from his supervisor, Dr. McGrath [118-8 ¶ 16]. When "men and women are equally good on the job, women should get more rapid raises after employment and the salaries should tend to converge." *King*, 678 F.3d at 475. Ms. White has created a triable issue as to her performance in comparable roles, yet the pay gap didn't narrow. Further, ECS admits that while there was a class system in place to determine salaries, it "would ultimately be Dr. Haworth's decision as to where an individual might be placed" [111-7 Tr. 28]. An *ad hoc* system is particularly troublesome when, on this record, it seems Dr. Haworth reclassified Ms. White's position from Class IV to Class III without explanation, so rather than narrow the gap widened [*id.* 31-32]. It seems Dr. Haworth had little difficulty adhering to ECS's practice not to reduce Dr. Woods' and Mr. Kovach's salaries when they transferred to a position of less responsibility [*see* 105-2 ¶ 37], so a reasonable jury would have cause to question why Ms. White was reclassified differently.

In recognition of the concerns "about the equity and the fairness" of this system [111-6 Tr. 46], ECS established an Administrative Salaries Committee to discover and address potential issues [111-12 ¶ 41]. Ms. White recalls that one of these concerns was that there were discrepancies based on gender [*id.*]. The Committee presented findings in November 2018 indicating there may have been a gender pay gap [*id.* ¶ 44], though ECS through Mr. Mow disputes this [105-1 ¶ 16]. Mr. Mow hired a subconsultant to address administrator compensation and disbanded the Committee [*id.* ¶ 17-18]. The manner in which this occurred also could be utilized by a reasonable jury. School counsel testified that ECS's pay practices were "rather willy nilly" and "a bit of a mishmash" even though he viewed it

16

all as a "legal mishmash" [111-7 Tr. 66]. A mishmash is not a bona fide reason to explain a gender wage disparity or reasonably in the eyes of a jury a basis to elude liability.

ECS points to Dr. Haworth's statement that ECS paid its female athletic director the same as the male director and made its female deputy superintendent the second highest paid employee in the district [105-2 ¶ 51]. ECS also points to the subcommittee's findings that some female administrators made more than their male counterparts [*see* 111-17]. These facts may contribute to that "mishmash," but whether other women enjoyed greater pay in their station speaks little on this record to whether Ms. White failed to receive equal pay for equal work. Drawing inferences in the light most favorable to Ms. White, a reasonable jury could find that there was a gender wage gap issue that would prevent ECS's bona fide use of the previous salaries of Mr. Kovach, Dr. Woods, and Mr. Lederach to elude liability. This issue must go to the jury.[1]

## CONCLUSION

Accordingly, the court DENIES the motion for summary judgment [103]. This case will proceed to trial.

SO ORDERED.

May 7, 2024                             *s/ Damon R. Leichty*
                                        Judge, United States District Court

---

[1] ECS also argues that the proper statute of limitations is two years. Though Ms. White does not respond to this argument, the court need not address it because it is undeveloped. ECS has not argued what aspects of Ms. White's claim should be dismissed, if at all, due to the statute of limitations. The court won't develop arguments for the parties. *See Gross v. Town of Cicero*, 619 F.3d 697, 704-05 (7th Cir. 2010).